[Crim. No. 2264. Second Appellate District, Division Two.—November 10, 1932.]

In the Matter of the Application of CLAUDE WILLIAMS for a Writ of Habeas Corpus.

David H. Clark and Harold Judson for Petitioner.

Buron Fitts, District Attorney, and Frank W. Stafford, Deputy District Attorney, for Respondent.

STEPHENS, J., *pro tem.*—Certain persons defendant were in the municipal court having their preliminary examination under charges of violation of section 337a of the Penal Code and conspiracy to violate such section. Petitioner was called and sworn as a witness, and upon certain questions being put to him he refused to answer them on the ground that the answers might tend to criminate him, article I, section 13, of the California Constitution providing that "no person shall be . . . compelled, in any criminal case, to be a witness against himself". Upon this refusal petitioner was adjudged in contempt of court and sent to jail therefor. He claims that he is imprisoned illegally and is here asking to be released through the writ of *habeas corpus.*

That the answers to the questions propounded might tend to incriminate petitioner is not questioned, and the constitutional privilege was rightfully exercised unless the offenses named in the charges against said referred to defendants are covered by the immunity statute. The section containing the provision for immunity (Pen. Code, sec. 334) reads: "No person, otherwise competent as a witness, is disqualified from testifying as such concerning the offense of gaming on the ground that such testimony may criminate himself; but no prosecution can afterwards be had against him for any offense concerning which he testified."

Hereinafter we shall refer to code sections chiefly by number, and in every instance the Penal Code of California is meant. We shall occasionally use italics to direct attention particularly to words and passages; they are ours, in every instance.

If this immunity statute is broad enough to cover the two offenses referred to, petitioner cannot avail himself of

the constitutional privilege, for the reason that he is forever protected from conviction or punishment for any offense concerning which he may be required to testify. (*Ex parte Clarke*, 103 Cal. 352 [37 Pac. 230].) The basis of the petition here is that section 334 is not coextensive with the Constitution as applied to the facts of this proceeding, and this because the immunity section applies alone to the offense of gaming as defined by section 330 and does not include the offenses defined in 337a; and even if it does include the offenses defined in 337a, it does not cover the offense of conspiracy to violate that section. We shall discuss the points in the order mentioned.

It will be of some importance to a complete understanding of petitioner's argument to recall that the three Penal Code sections of which we take particular note, viz., 330, defining gaming and providing a penalty for violation; 334, the immunity section, and 337a defining the substantive offenses here cognized, are all in chapter X of the code, headed "Gaming". Section 330 comes first, and covers generally a prohibition against the playing of, handling and dealing certain card games for percentage or for value. It also includes playing with dice or any device for value. This section is subheaded, "Gaming Prohibited—Penalty". Section 334, as above noted, is the immunity section. Section 337a, subheaded "Pool-Selling, Bookmaking, Bets and Wagers," defines six separate offenses: (1) pool-selling and bookmaking; (2) keeping or occupying premises for pool-selling and bookmaking or registering bets by device or paraphernalia; (3) holding of stakes for contests; (4) registration of bets on unknown contingencies; (5) owning or occupying premises for certain other purposes; (6) betting on certain contests.

To express the immediate problem in other and perhaps clearer words: Does the immunity go alone to the offenses referred to in section 330, or does it go to all gaming offenses, and are the offenses of 337a gaming offenses?

It is appropriate that we here get a clear understanding of the meaning of the term "gaming". Wharton's Dictionary of Jurisprudence, issue of 1860 (within the period of the early legislation), gives this definition: "Gaming or gambling, the art or practice of playing and following up any game, particularly those of hazards, as cards, dice,

eo-tables, etc.'' ''The terms 'gaming' and 'gambling', in their criminal sense, are synonymous. They have been used interchangeably in Rev. St. 1842, C. 220, secs. 3, 4; Gen. St. 1867, C. 254, secs. 6, 7, 8. The distinction between 'betting' and 'gaming' is that 'gaming' always includes a wager, while betting is not gaming unless the wager be laid on a game. It is betting on the game that constitutes gaming, and those game or gamble who thus bet. The word 'game' is very comprehensive and embraces every contrivance or institution which has for its object to furnish sport, recreation or amusement. Let a stake be laid upon the chances of a game, and we have gaming.'' *In re Opinion of Justices,* 73 N. H. 625 [63 Atl. 505, 507, 6 Ann. Cas. 689] (quoting Webster's Dict., Century Dict., and *People* v. *Weithoff,* 51 Mich. 203 [16 N. W. 442, 47 Am. Rep. 557]. Betting on a horse-race by device is held a ''game of chance''. (*Pompano, etc.,* v. *State,* 93 Fla. 415 [111 South. 801, 52 A. L. R. 51].) ''An instrument which is adapted and designed for the purpose of playing a game of chance for money and property and is so used, is a 'gambling device', within Kirby's Dig., sec. 1732.'' (*Johnson* v. *State,* 101 Ark. 159 [141 S. W. 493].) ''A 'device or apparatus for gambling' is a device or apparatus designed for carrying on actual gambling or determining whether the player is to win or lose, like the wheel of fortune, in its manifold modifications, and contrivances of that sort.'' (*People* v. *Engeman,* 129 App. Div. 462 [114 N. Y. Supp. 174].)

We shall now briefly review the history of gaming or gambling legislation in our state. When California so unceremoniously pushed herself into the Union as a full-formed state she had just emerged from a remote pastoral region to the greatest of all mining camps, and was host to the world's most venturesome denizens. There was, indeed, little chance for the satisfying society of the family circle, and there were none of the intellectual stimuli of a settled country. Men picked up fortunes from around their feet and valued them lightly, for there were others merely for the taking. Fortunes were the footballs of the period, and the goal was to win by the player's wits or luck. It is not strange, then, to find the second legislature, in 1851, passing a gambling *license* law, accepting gaming or gambling as a part of the custom of the day. Betting and

gambling were not illegal. (*Ex parte Roberts,* 157 Cal. 472 [108 Pac. 315], in the concurring opinion on page 478, discusses the common-law rule on gaming. Therein, also, section 337a of the Penal Code is construed, but it should be borne in mind that the section has since been extended and now includes a prohibition against betting on certain contests and against stakeholding.) By 1855, however, a sobering change in sentiment was strong enough to change the state's attitude toward gambling from legalization by license to disapproval, by "An Act to *Suppress* Gaming" (Hittell's Gen. Laws, sec. 3322). Two years later the legislature moved boldly to pass a law entitled "An Act to *Prohibit* Gaming" (Hittell's Gen. Laws, sec. 3329). The 1857 enactment, but not its predecessor, named the prevailing card games, but provided as well that anyone playing or running "any banking game played with cards, dice, or any other device . . . for money . . . or any representative of value, shall be guilty of a felony". Anyone permitting such games to be played for money in any place under his control was declared guilty of a misdemeanor. And herein occurs for the first time the forerunner of the immunity section under consideration in the instant proceeding, couched in much of the same phraseology. The 1857 statute was divided into several sections, and the immunity clause thereof used the expression, "concerning the offenses mentioned in the *foregoing sections*". In 1860 "An Act to Prohibit Gaming" was again passed, in which all offenses thereunder were made misdemeanors.

The Gaming Law as above delineated was the unquestioned predecessor of the code sections under chapter X of the present Penal Code entitled "Gaming", the old statute being broken up and rewritten in separate sections of the code. The section of the old statute that prohibited gaming (naming many games and referring to others) became section 330. The section of the old statute against owners and occupants of places in which prohibited gaming was carried on became section 331 of the code. Section 332 is new matter and prescribes the penalty for fraudulent playing. Section 333 is a repetition of the old statute penalizing a summoned witness for absence. Section 334 is the immunity section couched in the same general language but significantly different in one particular: For where the lan-

guage of the 1860 Gaming Law was " . . . witness[es] . . . disqualified . . . concerning the offenses mentioned in the foregoing *section* of this act", the code language is " . . . concerning the offense of *gaming*". Sections 330 and 334 remain practically the same. Section 335 provides duties of peace officers. Additions to the chapter have since been made, some unquestionably defining offenses of gaming, as, for instance, in 1874, when section 336 was enacted declaring it a misdemeanor to permit minors to play games of chance in saloons.

This history demonstrates that the legislature, after one experience of legalizing gambling by "license", soon changed its attitude and made an attempt to "suppress" and then to "prohibit" gaming. It legislated, through the provisions of section 330, against gambling methods in use at the time and prohibited gaming in general terms, thereby providing against new or different gambling methods of the future. Conviction was difficult, for witnesses were very likely to be involved in the very charges being investigated or in others related closely thereto. It was necessary, of course, to produce evidence in court, and the constitutional privilege blocked the efforts of the enforcement officers. The first immunity section was directed against all illegal *gaming*. When a chapter was given to gaming in the code the sections of the old statute became code sections. The immunity section had theretofore referred to all offenses mentioned in the act which then included all of the gaming offenses, but when it was carried into the code its provisions were not specifically limited to the prohibitions of section 330 as transplanted from the old act, but, instead, were given the wide application embraced in the term "concerning the *offense* of gaming". Clearly, as it seems to us, this was a generalization purposely designed to cover whatever was then or might thereafter be added to the law relating to that subject. Just as contemplated, the chapter has been added to from time to time, providing other offenses related to games or gambling. It is true that some of the new sections of the chapter relate to bribery in connection with games, and it may be that section 334 is not applicable to them; but it may be noticed that unlike some of the other immunity provisions of the law, 334 does not purport in its terms to refer to all of the sections of its *chapter,* as section

232, another immunity provision, does, but is specifically limited to the offense of "gaming". It seems to us that this point made by petitioner is not significant of anything here.

We conclude that the effective operation of the immunity section is not limited to section 330, but that it comprehends all offenses concerning gaming or gambling.

Coming now to the second phase of the problem before us, we shall consider whether or not the offenses charged against the referred to defendants are "offenses concerning gaming". We quote from the commitment: " . . . [D]efendants in Count I of said complaint [were charged] with the crime of conspiracy to violate section 337a of the Penal Code . . . in that said defendants had conspired to keep and occupy a certain place and enclosure, stands, rooms, booths and buildings, and certain books, papers, apparatus, devices and paraphernalia for recording and registering bets and purported bets, wagers and purported wagers, and for selling pools and purported pools, upon the results and purported results of certain contests and purported contests in speed and power of endurance of certain beasts, to-wit, dogs, and to make and accept bets and wagers and to sell pools and purported pools upon the results and purported results of said above mentioned contests and purported contests . . . [referring to the overt acts]; in the second count of said complaint the said individuals were charged with the substantive offense of a violation of section 337a of the Penal Code . . . wherein the said defendants were charged with receiving the sum of Two Dollars ($2.00) from one Joseph Doherty to hold and forward the same as a stake, pledge, bet and wager upon the result and purported result of a certain contest and purported contest in speed and power of endurance of certain beasts, to-wit, dogs."

After what has already been said herein it seems too plain for argument that count 2 as above set forth is of itself an offense of gaming. Exactly the same can be said as to the offenses defined in section 337a, the substantive basis for the conspiracy charge in the first count. It remains only, therefore, to determine whether or not the conspiracy charge is "an offense concerning gaming".

The overt act, alleged as having been committed are a part and parcel of the offense of gaming. They are plainly

"concerning the offense of gaming". If we follow the argument of petitioner in this particular we should have to hold that notwithstanding our conclusion that the immunity section would protect a witness in a trial on the substantive offense from prosecution, the witness could nevertheless be prosecuted in a trial upon a conspiracy charge, provable in part at least by the very testimony given by him in the former trial. If such a holding is reasonable and therefore necessary it would completely destroy the efficacy of the statute in question, for the immunity would not be coextensive with the Constitution. By the most liberal construction this meaning cannot be gotten from the section. What the statute means is that a witness called to testify to facts concerning or relating to the offense of gaming can safely testify for the reason that he is forever free from the possibility of punishment for any crime in the proof of which such testimony would be material. Such a construction is literally what the statute says, and it preserves the whole meaning and intention thereof. Such construction brings the statute within the rule that it must be coextensive with the Constitution.

It may be said that the statute refers less to the name of the offense than to the facts constituting the offense. Any witness who testifies to facts concerning or relating to prohibited gaming is immune from punishment for any offense in the proof of which such facts would be relevant and material. The principle is illustrated in *People* v. *Schwartz*, 78 Cal. App. 561, 567, 568 [248 Pac. 990, 993]. That proceeding arose in a charge of conspiracy to obtain money by fraudulent pretenses and representations. The statute there under consideration (Stats. 1917, p. 673 et seq.) provides for testimony to be taken by the corporation commissioner under oath after issuance of a subpoena, and by section 17 witnesses may not refuse to give testimony because they are excused from prosecution "for or on account of any act, transaction, matter or thing concerning which [they] shall have been so compelled to testify". At the time such testimony was given no criminal proceeding had even been started. Nevertheless the court held that the witness was immune from punishment or prosecution in a subsequent trial of conspiracy because he had testified before the commissioner concerning events and acts which proved

to be relevant and material in the subsequent trial. The concluding clause of section 334 of the Penal Code, "but no prosecution can afterwards be had against him for any offense *concerning which he testified*", is in effect the same and as broad as the expression in the statute referred to in the Schwartz case, to wit: "No person shall be prosecuted . . . for or on account of any act, transaction, matter or thing concerning which he shall have been so compelled to testify".

The case of *People* v. *Newmark*, 312 Ill. 625 [144 N. E. 338], is not in conflict with the views herein expressed. That case is one related in time and fact to *People* v. *Boyle*, 312 Ill. 586 [144 N. E. 341], and is entirely in harmony with it. Both give very clear analyses of the principle that the immunity statute when related to the facts at hand must be coextensive with the Constitution. The Newmark case is one wherein the facts take it outside the operation of the statute, and the Boyle case is one wherein the facts bring it within the operation of the statute. *Ex parte Cohen*, 104 Cal. 524 [38 Pac. 364, 43 Am. St. Rep. 127, 26 L. R. A. 423], *Bradley* v. *Clark*, 133 Cal. 196 [65 Pac. 395], *Rebstock* v. *Superior Court*, 146 Cal. 308 [80 Pac. 65], and *In re Tahbel*, 46 Cal. App. 755, 758 [189 Pac. 804], are all in accord with the principles herein lastly treated.

We conclude that the statute grants an immunity coextensive with the Constitution, in accordance with the doctrine of *Counselman* v. *Hitchcock*, 142 U. S. 547 [12 Sup. Ct. Rep. 195, 35 L. Ed. 1110], and the California cases cited herein.

The writ is discharged.

Works, P. J., and Thompson (Ira F.), J., concurred.